**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

ISHMEAL ELMORE,

                Plaintiff,

        -v-                               5:24-CV-186 (AJB/TWD)

MITCHELL HARRIMAN and
K9 OFFICER RAJCHEL,

                Defendants.

_____

**APPEARANCES:**                            **OF COUNSEL:**

ISHMEAL ELMORE
Plaintiff, Pro Se
24-B-3004
Wyoming Correctional Facility
P.O. Box 501
Attica, NY 14011

CITY OF SYRACUSE                        DARIENN BALIN, ESQ.
CORPORATION COUNSEL            CONNOR J. SIMONETTA, ESQ.
Attorneys for Defendants
233 East Washington Street
City Hall, Room 300
Syracuse, NY 13202

**Hon. Anthony Brindisi, U.S. District Judge:**

<u>**DECISION and ORDER**</u>

## I.    INTRODUCTION

On February 7, 2024, _pro se_ plaintiff Ishmeal Elmore ("plaintiff") filed this 42 U.S.C. §

1983 action alleging that two John Does employed by the Syracuse Police Department violated

his rights during a traffic stop.  Dkt. No. 1.  Along with his complaint, plaintiff moved for leave

to proceed _in forma pauperis_ ("IFP Application"), Dkt. Nos. 2, 3, and for counsel, Dkt. No. 4.

The matter was assigned to U.S. District Judge Glenn T. Suddaby, who referred the case to the magistrate judge for an initial review. While the matter was pending before the magistrate judge, plaintiff filed a letter in which he provided the names of the two Does: Mitchell Harriman, badge #1314 ("Harriman"), and K-9 handler unit K905 Officer Rajchel ("Rajchel"). Dkt. No. 5. The magistrate judge construed plaintiff's letter as a request to amend his complaint to substitute Harriman and Rajchel as the named defendants and, so construed, granted that request. Dkt. No. 6. After a clarification about the spelling of Harriman's name, Dkt. No. 7, the Clerk of the Court updated the docket accordingly, Dkt. No. 8.

On April 19, 2024, U.S. Magistrate Judge Thérèse Wiley Dancks granted plaintiff's IFP Application, denied without prejudice his motion for counsel, and, after an initial review of the pleading, ordered defendants Harriman and Rajchel to respond to the three § 1983 claims that, liberally construed, she had identified in plaintiff's initial complaint:

> Count one alleges an "unreasonable seizure" in violation of the Fourth Amendment based on the "prolonged detention beyond the time reasonably required to issue . . . the traffic citations[.]" Count two alleges an "unreasonable" search of Plaintiff's vehicle in violation of the Fourth Amendment. Count three alleges deliberate indifference in violation of the Fourteenth Amendment based on the prolonged exposure to the winter elements.

Dkt. No. 9 at 7–8 (emphases added) (cleaned up).[1] Harriman and Rajchel answered, Dkt. No. 26, and the matter was reassigned to this Court for all further proceedings, Dkt. No. 37.

On March 4, 2025, Harriman and Rajchel (collectively "defendants") moved under Rule 12(c) of the Federal Rules of Civil Procedure for a partial judgment on the pleadings. Dkt. No. 38. There, defendants argued: (1) the "unreasonable seizure" claim should be dismissed against

---

[1] Pagination corresponds with CM/ECF headers.

Rajchel; (2) the "unreasonable search" claim should be dismissed against Harriman; and (3) the "deliberate indifference" claim should be dismissed against Rajchel *and* Harriman.  *Id.*

Plaintiff initially failed to respond.[2]  *See* Dkt. No. 41.  But shortly after the time period in which to do so had expired, plaintiff filed a belated opposition memorandum, Dkt. No. 42, and, a few days later, he cross-moved for leave to file an amended complaint, Dkt. No. 43.  In response, defendants moved to strike plaintiff's opposition filing because it was untimely.  Dkt. No. 44.

On April 18, 2025, this Court denied the motion to strike, accepted for filing plaintiff's opposition papers, and ordered defendants to respond to plaintiff's cross-motion to amend.  Dkt. No. 45.  As relevant here, the Court also instructed defendants to "include argument on whether plaintiff's proposed amended pleading (Dkt. No. 43 at pages 22–34) should be accepted for filing as the operative pleading this action."  *Id.*  Thereafter, defendants opposed the cross-motion to amend on the grounds that it is procedurally deficient and meritless.  Dkt. No. 48.

The cross-motions are fully briefed and will be considered on the basis of the available submissions without oral argument.

## II.    BACKGROUND

Plaintiff's complaint and his proposed amended complaint contain substantively identical factual allegations with a few minor exceptions.  *Compare* Dkt. No. 1 at 3–9, *with* Dkt. No. 43 at 22–30.  For reasons that will be discussed *infra*, the following facts are taken from the proposed amended complaint and assumed true for the purpose of resolving the pending cross-motions.

---

[2]  Plaintiff is *pro se* and incarcerated.  The docket report shows that there were two undelivered mailings to plaintiff near the outset of this action.  Dkt. Nos. 19, 25.  Those undelivered mailings appear to have occurred while he was being moved between facilities.  However, a third mailing was returned as undelivered because plaintiff refused to accept legal mail.  Dkt. No. 30.  Thereafter, Judge Dancks cautioned plaintiff that he must accept legal mail from the Court and from defendants' counsel or risk the dismissal of this action.  Dkt. No. 33.

On January 4, 2023, at about 10:45 p.m., plaintiff and his girlfriend drove to a store on Butternut Street in Syracuse, New York. Am. Compl. at 24. Plaintiff went in, bought some cigarettes, and then "crack[ed] a few jokes briefly with a friend [he] knew outside the store before carrying on with the rest of [his] night." *Id*. When plaintiff got back into his car, his girlfriend told him that while he was joking outside the store with his friend, "the police had drove by giving [him] and [his] car 'dirty looks.'" *Id*.

Plaintiff left the parking lot, drove north on Butternut Street, and turned right onto Park Street. *See* Am. Compl. at 24. As he drove down Park Street, plaintiff's girlfriend noticed "the same cops from the store" were "now trailing behind [them] a few blocks away." *Id*. Plaintiff soon turned left onto Oak Street, where he saw the police "closing the gap between [them] very fast, undoubtedly speeding in this residential neighborhood." *Id*. at 24–25.

The police car stopped plaintiff's vehicle near the intersection of Rugby Road and Helen Street. Am. Compl. at 25. "After about 10 minutes of waiting," Harriman approached plaintiff's car and demanded his license, registration, and proof of insurance. *Id*. Plaintiff gave Harriman the documents. *Id*. Harriman told plaintiff he had stopped him "for excessive window tint" and asked plaintiff if he "had any drugs or guns in [his] vehicle." *Id*. Plaintiff replied "no." *Id*. Harriman took plaintiff's documents back to his patrol car. *Id*.

Plaintiff's girlfriend became frustrated. *See* Am. Compl. at 25–26. She exited the car and began walking home. *Id*. at 26. But plaintiff waited in his car and set his "phone to video record." *Id*. "A while later backup arrive[d] and both officers simultaneously approach[ed]" his vehicle. *Id*. Harriman "ask[ed] plaintiff to step out of [his] vehicle." *Id*. Plaintiff complied immediately. *Id*. Plaintiff was "ushered to the rear" trunk area of his vehicle, where Harriman

and his partner, Officer Glynn, conducted a "pat-frisk." *Id*. at 26, 32 (identifying Harriman's "partner" as proposed defendant Officer Glynn).

Harriman asked plaintiff where he was coming from and where he was headed. *See* Am. Compl. at 26. Plaintiff explained that he was "coming from the store on Butternut and was now heading home." *Id*. Harriman responded that he "was also at the store" and "observed" plaintiff "hand somebody something." *Id*. Plaintiff denied this. *Id*. He responded to Harriman that he was "mistaken" because he "did not 'hand' anybody anything." *Id*. After some back and forth, plaintiff told Harriman that he did "not wish to answer any questions that do not pertain to this traffic infraction." *Id*. at 27.

Harriman responded, "OK well I'm calling the K-9 Unit." Am. Compl. at 27. "For over the next 20 minutes [plaintiff was] left standing in the freezing cold waiting on the arrival of the K-9 Unit." *Id*. Although plaintiff told Harriman he was "getting very cold" during this waiting period, plaintiff was "not allowed to re-enter" his vehicle "to gain any warmth." *Id*.

Defendant Rajchel eventually arrived with a K-9 Unit. Am. Compl. at 27. Rajchel and the police dog made "at least [three] dozen laps around the exterior" of plaintiff's car "without anything happening." *Id*. at 27. In "frustration," Rajchel opened the "car door and signal[ed] for the [dog] to jump inside." *Id*. at 28. Rajchel allowed the dog to "freely run rampant inside the interior" of the vehicle. *Id*. Plaintiff continued to complain to Harriman and others that he was "extremely cold." *Id*. According to plaintiff, at no point during this encounter did the dog ever "positively alert to any contraband or act out of the ordinary." *Id*.

Eventually, Rajchel opened the driver's door of plaintiff's vehicle and let the police dog out. Am. Compl. at 28. Plaintiff was allowed to go back and sit inside his car. *Id*. By that time, plaintiff was "cold to the bone," his feet and hands were "numb," and he was "left feeling totally

violated." *Id*. "After many more minutes of waiting," Harriman handed plaintiff his "personal documents and traffic tickets." *Id*. at 28–29. Harriman told plaintiff he was "free to leave." *Id*.

Plaintiff alleges the "whole situation lasted at least an hour and the prolonged exposure to the winter elements caused [him] to be very sick for the entire week following this incident," and he was left "bed-ridden" from "severe flu-like symptoms." Am. Compl. at 29. In addition to the foregoing "physical trauma," plaintiff alleges he "developed an unnatural fear of traffic stops and police encounters overall." *Id*. "Whenever police are now behind [plaintiff] on the roadway," he has "flashbacks of this incident triggering severe anxiety attacks." *Id*.

## III.    LEGAL STANDARD

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." FED. R. CIV. P. 12(c). "The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that for granting a Rule 12(b)(6) motion for failure to state a claim." *Lynch v. City of N.Y.*, 952 F.3d 67, 75 (2d Cir. 2020) (cleaned up). To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. To assess this facial plausibility requirement, the court "must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and draw all reasonable inferences in the plaintiff's favor, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). In doing so, the court confines itself to the facts alleged

in the pleading, documents attached to the complaint or incorporated by reference, and matters of which judicial notice may be taken. *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016).

## IV.    DISCUSSION

As an initial matter, it is important to bear in mind that plaintiff is *pro se*. So plaintiff's pleadings must be held to less stringent standards than those drafted by an attorney. *See Ahlers v. Rabinowitz*, 684 F.3d 53, 60 (2d Cir. 2012). As the Second Circuit has repeatedly explained, *pro se* filings must be construed liberally, given "special solicitude," and interpreted to raise the strongest claims that they suggest. *Hogan v. Fischer*, 738 F.3d 509, 515 (2d Cir. 2013). "This is particularly so when the *pro se* plaintiff alleges that [his] civil rights have been violated." *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008).

Consistent with this solicitudinous approach to unrepresented pleadings, Judge Dancks liberally construed plaintiff's initial complaint to assert three individual-capacity § 1983 claims for money damages against Harriman and Rajchel for: (1) unreasonable seizure; (2) unreasonable search; and (3) deliberate indifference.

In support of their motion for a partial judgment on the pleadings, defendants argued that plaintiff's initial complaint failed to plausibly allege: (1) that Rajchel was "personally involved" in the seizure; (2) that Harriman was "personally involved" in the K-9 search of the vehicle; and (3) that neither Harriman nor Rajchel were "personally involved" in conduct that might plausibly give rise to a claim for deliberate indifference. Defs.' Mem., Dkt. No. 38-2 at 11–18.

Plaintiff's proposed amended complaint re-asserts these three § 1983 claims but seeks to add a third defendant named "Officer Glynn" and six more § 1983 claims: three against Glynn and three against Harriman. Am. Compl. at 22–34. In their opposition to plaintiff's attempt to

amend his pleading, defendants contend that this proposed amended complaint is procedurally deficient and, in any event, the amendments would be futile.  Defs.' Reply, Dkt. No. 48 at 6.

**A.  Plaintiff's Proposed Amended Complaint**

The first question is what to do about plaintiff's proposed amended pleading under these circumstances.  Defendants have already answered plaintiff's initial complaint and moved for a partial judgment on the pleadings.  But if plaintiff's cross-motion to amend is granted, in whole or in part, the initial complaint will no longer be the "operative" pleading.  Because defendants' motion against the first pleading would technically be moot, they would ordinarily have to join issue with a second answer to the amended pleading and/or file another motion, either to dismiss the amended complaint or, as before, for a partial judgment on the revised set of pleadings.

This "moot and re-brief" approach is appropriate in certain situations.  For instance, an amended pleading will sometimes identify totally different defendants or assert distinct claims based on a different or additional set of facts.  "Under those circumstances, the better course of action is likely to permit the amendment and then invite another round of [ ] briefing."  *Byrd v. Town of DeWitt*, 698 F. Supp. 3d 379, 386 (N.D.N.Y. 2023).

But that approach is not necessary in this case.  Plaintiff's proposed amended complaint names a "new" defendant, but it is someone who was already identified as an actor in plaintiff's initial complaint: Officer Glynn, Harriman's "partner."  Likewise, although plaintiff's proposed amended complaint seeks to add six § 1983 causes of action, those "new" claims arise from the same set of facts that were already alleged: the prolonged traffic stop and ensuing dog sniff.

Under these circumstances, "district courts often streamline their analysis with a time-saving strategy: they simply evaluate the pending motion to dismiss in light of the facts alleged in the proposed amended pleading."  *Byrd*, 698 F. Supp. 3d at 386.  Indeed, the Second Circuit

has endorsed this as a "sound approach that promotes judicial economy by obviating the need for multiple rounds of briefing." *Pettaway v. Nat'l Recovery Sols., LLC*, 955 F.3d 299, 303 (2d Cir. 2020). Although defendants filed a post-answer motion for a judgment on the pleadings rather than a pre-answer motion to dismiss, a streamlined analysis is still the right approach—the court can help avoid an additional round of briefing by evaluating whether any of the § 1983 claims in plaintiff's proposed amended complaint are sufficiently alleged to survive a motion to dismiss.

This conclusion leads to a related, technical issue raised by defendants: whether a special standard for reviewing the amended pleading should be applied. Where, as here, the time period in which to amend a complaint "as of right" has already expired, the rules state that "a party may amend its pleading only with the opposing party's written consent or the court's leave." FED. R. CIV. P. 15(a)(2). This is still treated as a fairly permissive standard, especially when the party's request to amend occurs early in the litigation. *See Foman v. Davis*, 371 U.S. 178, 182 (1962).

However, this permissive standard is not limitless. For instance, "it is well established that leave to amend a complaint need not be granted where amendment would be futile." *Ellis v. Chao*, 336 F.3d 114, 127 (2d Cir. 2003). "An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)." *Lucente v. Int'l Bus. Mach. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002). Further, since the legal standard for a Rule 12(c) motion is the same as the one used for a Rule 12(b)(6) motion, *Lynch*, 952 F.3d at 75, this "futility" analysis is the same "plausibility" standard that ordinarily applies, *i.e.*, the plaintiff must plead enough facts to "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Iqbal*, 556 U.S. at 678.

Defendants correctly point out that a more restrictive "good cause" standard can limit the party's ability to seek an amendment where, as here, the relief would require the court to modify

a pre-trial deadline in a scheduling order.  *See, e.g.*, *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 115 (2d Cir. 2021) (explaining that the "liberal" amendment period can be ended by a scheduling order).

However, it would be unfair to apply anything more restrictive than an ordinary "futility" or "plausibility" analysis at this juncture.  Plaintiff is unrepresented.  He promptly informed the Court of the identities of the former John Does, Harriman and Rajchel.  This is his first attempt at a formal amendment.  A further attempt to amend will require a compelling explanation for the further delay and an accompanying justification, likely based on a showing of "good cause."  But the general practice at this early stage of civil litigation is to give a plaintiff—especially a *pro se* plaintiff—at least one additional opportunity to demonstrate that they have plausible claims.

In sum, defendants' pending motion for a partial judgment on the pleadings (which uses the same standard as a motion to dismiss) will be evaluated against plaintiff's proposed amended complaint.  If one or more of plaintiff's § 1983 claims in the proposed amended complaint would *not* survive a motion to dismiss, whether against Harriman, Rajchel, or the newly named Officer Glynn, then plaintiff's cross-motion to amend his complaint to include those § 1983 claims must be denied (whether in part or in whole) as "futile."

**B.  42 U.S.C. § 1983**

The next step is to consider the merits of plaintiff's § 1983 claims.  "Section 1983 creates a cause of action based on personal liability and predicated upon fault."  *Dukes v. City of Albany*, 492 F. Supp. 3d 4, 11 (N.D.N.Y. 2020) (citation omitted).  Although the exact showing required to win relief depends on the type of constitutional violation alleged, *Brandon v. Kinter*, 938 F.3d 21, 38 (2d Cir. 2019), as a general matter a § 1983 claim holds an individual personally liable for the role his or her own acts or omissions played in the alleged violation, *Iqbal*, 556 U.S. at 676.  Thus, "[t]o establish a Section 1983 violation, a plaintiff must plead (and later prove) that each

defendant was personally involved in the alleged constitutional violation." *Wiggins v. Griffin*, 86 F.4th 987, 996 (2d Cir. 2023).

Plaintiff's proposed amended complaint asserts nine § 1983 claims based on the allegedly unreasonable nature and length of the seizure (*i.e.*, the traffic stop), the allegedly improper nature of the "searches" that occurred (*i.e.*, a pat-frisk of his person and a dog sniff of his vehicle), and, finally, defendants' alleged conduct during these events (*i.e.*, their deliberate indifference).[3]

These § 1983 claims are grounded in the Fourth Amendment. The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. Reasonableness in the Fourth Amendment context is "generally assessed by carefully weighing the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Cnty. of Los Angeles v. Mendez*, 581 U.S. 420, 427 (2017) (cleaned up).

### 1. Unreasonable Seizure

Plaintiff's proposed amended complaint asserts seizure claims in Counts One, Five, and Nine. In Count One, plaintiff alleges Harriman and Rajchel unreasonably prolonged the traffic stop. Relatedly, in Count Nine, plaintiff alleges Harriman's intrusive conduct during the traffic stop caused the seizure to ripen into a *de facto* arrest. And in Count Five, plaintiff alleges that Glynn failed to intervene to prevent this unreasonably prolonged traffic stop and *de facto* arrest.

A traffic stop is a Fourth Amendment seizure. *Brendlin v. California*, 551 U.S. 249, 255 (2007). "Police stops fall into two categories: arrests and *Terry* stops." *Grice v. McVeigh*, 873 F.3d 162, 167 (2d Cir. 2017). "Arrests require probable cause." *Id.* However, in *Terry v. Ohio*,

---

[3] Plaintiff's proposed amended complaint seeks money damages against non-policymaking state actors. These are considered "individual-capacity" § 1983 claims. *See, e.g.*, *Kentucky v. Graham*, 473 U.S. 159, 165 (1985); *Vincent v. Yelich*, 718 F.3d 157, 177 (2d Cir. 2013).

the Supreme Court held that an officer may "conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry*, 392 U.S. 1, 30 (1968)). As the Second Circuit has explained, these so-called "*Terry* stops are lawful custodial interrogations that do not rise to the level of an arrest." *Soukaneh v. Andrzejewski*, 112 F.4th 107, 117 (2d Cir. 2024).

A *Terry* stop is lawful "as long as the officer has reasonable suspicion that the person to be detained is committing or has committed a criminal offense." *Grice*, 873 F.3d at 167 (quoting *United States v. Compton*, 830 F.3d 55, 61 (2d Cir. 2016)). Reasonable suspicion requires more than a "hunch" about some kind of criminal activity. *United States v. Singletary*, 798 F.3d 55, 60 (2d Cir. 2015) (explaining that a "hunch" is "a conclusion derived from intuition in the absence of articulable, objective facts").

However, courts have repeatedly held that the standard for reasonable suspicion is "not high." *United States v. Bailey*, 743 F.3d 322, 332 (2d Cir. 2014) (citing *Richards v. Wisconsin*, 520 U.S. 385, 394 (1997)). This relatively low standard is "less than probable cause, requiring only facts sufficient to give rise to a reasonable suspicion that criminal activity 'may be afoot' and that the person stopped '*may* be armed and presently dangerous." *Bailey*, 743 F.3d at 332 (quoting *Terry*, 392 U.S. at 30) (emphasis in original).

The question of whether a police officer's suspicion is reasonable is an "objective inquiry based on the totality of the circumstances as they would appear through the eyes of a reasonable and cautious police officer, guided by his experience and training," *Grice*, 873 F.3d at 167, and "commonsense judgments and inferences about human behavior," *United States v. Weaver*, 9 F.4th 129, 140 (2d Cir. 2021) (en banc).

### a. Prolonged Stop

Measured against this general legal standard, plaintiff's proposed amended complaint has plausibly alleged that Harriman unreasonably prolonged the traffic stop (Count One).

A Fourth Amendment seizure must be justified at its inception. *Kansas v. Glover*, 589 U.S. 376, 386 (2020). Plaintiff alleges that Harriman said he stopped him for excessive window tint, which is a valid basis for a traffic stop. *United States v. Stewart*, 551 F.3d 187, 191 (2d Cir. 2009) ("A traffic stop based on a reasonable suspicion of a traffic violation comports with the Fourth Amendment."). Liberally construed, plaintiff's proposed amended complaint might also be understood to allege that Harriman's assertion about the excessive window tint was merely a pretext used to investigate his belief that a drug transaction occurred at the store. But reasonable suspicion is an objective standard, which means that the existence of a pretext does not render an otherwise-permissible Fourth Amendment seizure invalid. *See, e.g.*, *Whren v. United States*, 517 U.S. 806, 813 (1996).

During a traffic stop, "an officer may question the occupants of a vehicle about matters unrelated to the stop as long as the inquiries do not measurably extend the duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009). However, a valid stop for a traffic infraction does not give a police officer "bonus time to pursue an unrelated criminal investigation." *Rodriguez v. United States*, 575 U.S. 348, 357 (2015). Thus, a traffic stop that is justified at its inception can become unlawful if it is prolonged beyond the time reasonably required to complete the "mission" of the stop. *Id*. at 354 ("Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed.").

Broadly construed, plaintiff alleges that Harriman unreasonably prolonged the traffic stop and summoned the K-9 unit to conduct a fishing expedition for drugs or other contraband inside

his vehicle.[4]  Although an officer may lawfully extend the duration of the traffic stop to pursue a further investigation when he develops enhanced suspicion about additional criminal activity, the objective reasonableness of Harriman's conduct vis-à-vis the extension of the stop that allegedly occurred here cannot be determined on the pleadings alone.  *See, e.g.*, *United States v. Santillan*, 902 F.3d 49, 56–57 (2d Cir. 2018).  Accordingly, plaintiff's proposed amended complaint has plausibly alleged that Harriman unreasonably prolonged the traffic stop (Count One).

However, this "prolonged stop" claim must be dismissed insofar as it is asserted against Rajchel (in Count One) or Glynn (in Count Five).  Plaintiff alleges that Harriman stopped his car and initiated inquiries about plaintiff's conduct back at the store.  Rajchel and Glynn arrive later in the story.  As defendants point out, the only alleged "personal involvement" that Rajchel had in the events about which plaintiff complains arises from the allegedly unreasonable search of his vehicle (discussed *infra*).  Absent some non-conclusory factual allegations tending to show that Rajchel helped to "seize" plaintiff, it is hard to conclude that the proposed amended complaint plausibly alleges that Rajchel was "personally involved" in an unreasonable seizure.  The same is true of Glynn, who is referenced only in passing as a possible participant in the later pat-frisk.

Although in certain situations an officer who is a bystander to a constitutional violation can be held liable for a "failure to intervene," *see Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994), plaintiff has not alleged facts tending to show that Rajchel or Glynn knew or had reason to know of the prolonged-seizure-based deprivation that plaintiff was suffering as a result of Harriman's alleged conduct.  Accordingly, plaintiff's § 1983 "prolonged stop" claim must be dismissed insofar as it is asserted against Rajchel (in Count One) or Glynn (in Count Five).

---

[4]  As noted *supra*, defendants did not move to dismiss this claim against Harriman.  The Court includes Harriman in the analysis for the sake of completeness.

### b. *De Facto* Arrest

As noted *supra*, plaintiff's proposed amended complaint asserts new § 1983 claims based on the traffic stop. Plaintiff alleges that Harriman's conduct during the traffic stop ripened into a *de facto* arrest (in Count Nine) and that Glynn failed to intervene on his behalf (in Count Five).

A *Terry* stop that involves sufficiently intrusive law enforcement conduct may ripen into a *de facto* arrest. *United States v. Sharpe*, 470 U.S. 675, 685 (1985). "Arrests require probable cause." *Grice*, 873 F.3d at 167. To determine whether a *Terry* stop constituted a *de facto* arrest that required probable cause, courts consider factors such as:

> (1) the length of time involved in the stop; (2) its public or private setting; (3) the number of participating law enforcement officers; (4) the risk of danger presented by the person stopped; and (5) the display or use of physical force against the person stopped, including firearms, handcuffs, and leg irons.

*United States v. Fiseku*, 915 F.3d 863, 870 (2d Cir. 2018) (quoting *United States v. Newton*, 369 F.3d 659, 674 (2d Cir. 2004)). "[T]he law recognizes the important need to allow authorities to graduate their responses to the demands of any particular situation." *Newton*, 369 F.3d at 674 (cleaned up). Accordingly, no single factor is determinative. *See id*.

Upon review, plaintiff's proposed amended complaint does not plausibly allege that the circumstances of the traffic stop were sufficiently intrusive to rise to the level of a *de facto* arrest. Courts have repeatedly dismissed this kind of § 1983 claim where, as here, the traffic stop was at the roadside, for a limited duration of time, few officers participated, and no meaningful show of coercive force—such as handcuffs, drawn weapons, or other coercive indicia tending to escalate the encounter—was involved. *Newton*, 369 F.3d at 674 (collecting cases).

Because this § 1983 claim fails against Harriman, the derivative § 1983 claim, *i.e.*, that Glynn failed to intervene on his behalf to prevent this misconduct, must also be dismissed. *See*

*Jackson v. Mastrangelo*, 405 F. Supp. 3d 488, 493 (W.D.N.Y. 2019) (explaining the contingent nature of a § 1983 claim alleging failure to intervene).  Accordingly, plaintiff's § 1983 "*de facto* arrest*"* claim must be dismissed against Harriman (in Count Nine) and Glynn (in Count Five).

   **2.  Unreasonable Search**

   Plaintiff's proposed amended complaint asserts search claims in Counts Two, Four, Six, Seven, and Eight.  First, in Counts Four and Seven, plaintiff alleges that Harriman and Glynn conducted an unreasonable pat-frisk.  Second, in Count Two, plaintiff alleges that Harriman and Rajchel unreasonably "searched" his car with the police dog.  Relatedly, in Counts Six and Eight, plaintiff alleges that Glynn and Harriman failed to intervene to prevent this unreasonable search.

   **a.  The Pat-Down Frisk**

   First, plaintiff alleges that Harriman and Glynn conducted an unreasonable search when they directed him to exit his vehicle and pat-frisked him (in Counts Four and Seven).

   The hazardous nature of a vehicle stop "supports the need for added safeguards."  *United States v. Alexander*, 907 F.2d 269, 273 (2d Cir. 1990) (citing *Michigan v. Long*, 463 U.S. 1032, 1047–49 (1983)).  The police may order the occupants of a lawfully stopped vehicle to step out of the car as a safety measure.  *Maryland v. Wilson*, 519 U.S. 408, 410 (1997).  As relevant here, the police may also conduct a limited, self-protective search of a person's "outer clothing. . . in an attempt to discover weapons which might be used to assault him."  *Terry*, 392 U.S. at 30.[5]

   This limited, self-protective search of a person's outer clothing is sometimes called a "pat-down" or a "pat-frisk."  Because the purpose of a pat-frisk is to "help law enforcement ascertain whether a suspect has a weapon which might be used to harm the officer or others nearby," *Weaver*, 9 F.4th at 140 (cleaned up), in order "[t]o justify a patdown of the driver or a

---

[5]  The police can "frisk" a vehicle for readily accessible weapons, too.  *United States v. Hussain*, 835 F.3d 307, 313 (2d Cir. 2016).

passenger during a traffic stop, . . . the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous," *Arizona*, 555 U.S. at 327.

Measured against this general standard, plaintiff's proposed amended complaint plausibly alleges that Harriman pat-frisked him without reasonable suspicion to believe he was armed with any weapons.  This conclusion is a close call.  On the one hand, plaintiff's pleading alleges that Harriman claimed to have observed him "hand somebody something" outside of the convenience store.  Harriman's prior observations—whatever they were—would contribute to the quantum of suspicion he had obtained by the time he conducted the pat-frisk.  On the other hand, though, plaintiff contends that Harriman "did not observe any bulges on [his] person" or "witness any furtive or suspicious movements while in his presence."  Dkt. No. 43 at 16.

"The purpose of a protective search is to allow an officer to do his job safely, and so the only question for Fourth Amendment purposes is whether the officer's basis for thinking that the suspect might be carrying a weapon rises to the level of reasonable suspicion."  *Weaver*, 9 F.4th at 149.  However, the self-protective rationale that authorizes a limited search for weapons does not authorize a police officer to search for anything *other* than weapons.  *Ybarra v. Illinois*, 444 U.S. 85, 94 (1979); *Adams v. Williams*, 407 U.S. 143, 146 (1972) ("[T]he purpose of [a *Terry*] search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence . . . . ").

A more intrusive search would require a different rationale.  Thus, mindful of plaintiff's *pro se* status and of the threshold procedural posture of this case, this § 1983 claim would benefit from the development of additional context.  *Weaver*, 9 F.4th at 149 (explaining that "context is king in Fourth Amendment analysis").  Accordingly, plaintiff's cross-motion to amend will be

granted in part, and plaintiff's § 1983 "pat frisk" claim against Harriman in Count Seven will be accepted for filing.

However, plaintiff has not plausibly alleged that Glynn personally engaged in actionable misconduct in connection with this pat-frisk. Aside from identifying Glynn as another officer on the scene, plaintiff treats Glynn as an afterthought. *See* Dkt. No. 43 at 10, 16. Notably, plaintiff has not offered a non-conclusory basis on which to conclude that Glynn did anything to exceed the bounds of the self-protective search authorized by *Terry*. *See, e.g.*, *Jackson v. Mastrangelo*, 582 F. Supp. 3d 91, 97–98 (W.D.N.Y. 2022) (collecting cases recognizing that inappropriate touching during a pat-frisk can give rise to an actionable Fourth Amendment claim); *United States v. McDow*, 206 F. Supp. 3d 829, 855 (S.D.N.Y. 2016) (collecting cases recognizing that an intrusive search of a suspect's clothing is not justified under *Terry*).

Instead, plaintiff contends that Harriman "initiated" the pat-frisk without justification and asserts that Glynn should have known the pat-frisk was unjustified, too. *Compare* Dkt. No. 43 at 16, *with id*. at 10. But as defendants point out, plaintiff has not offered any factual allegations about what Glynn did or did not know at the time of the pat-frisk. Nor has plaintiff offered facts tending to show what Glynn did or did not do at the time of this search. Again, while in certain situations an officer who is a bystander to a constitutional violation can be held liable for failing to act to prevent harm, plaintiff's proposed amended complaint does not allege facts sufficient to plausibly establish that Glynn knew or had reason to know that Harriman's pat-frisk of plaintiff was unjustified and of sufficient duration as to permit Glynn to be held liable for failing to take action to try to prevent the event from occurring. *See, e.g.*, *Lennox v. Miller*, 968 F.3d 150, 158 (2d Cir. 2020) (noting that failure-to-intervene theory requires indication that bystander "had a

realistic opportunity to intervene"). Accordingly, plaintiff's § 1983 "pat frisk" claim must be dismissed against Glynn in Count Four.

### b. The Dog Sniff & Entry

Second, plaintiff alleges that Harriman and Rajchel unreasonably searched the interior of his vehicle with the police dog (in Count Two) and that Harriman and Glynn failed to intervene to prevent this unreasonable search (in Counts Six and Eight).

"In the course of *Terry* stops, police routinely employ a range of investigative techniques not limited to detainee questioning and not requiring detainee participation." *United States v. Bailey*, 743 F.3d 322, 338 (2d Cir. 2014) (collecting cases). Without belaboring the technical distinctions, the constitutional validity of a Fourth Amendment "search" has historically hinged on whether police violated a reasonable expectation of privacy. *Florida v. Jardines*, 569 U.S. 1, 10–11 (2013) (explaining distinction between "traditional property-based understanding" and the "reasonable-expectations test"). One consequence of this approach is that a police dog's sniff of the exterior parts of a vehicle during an otherwise-lawful *Terry* stop "does not rise to the level of a constitutionally cognizable infringement." *Illinois v. Caballes*, 543 U.S. 405, 409 (2005).

This body of constitutional law consistently—if counterintuitively—holds that a dog sniff is typically not a "search" under the Fourth Amendment. *See, e.g.*, *United States v. Iverson*, 897 F.3d 450, 461 (2d Cir. 2018) (collecting cases). Even so, the inquiry into whether the police may lawfully examine the interior of a space (using a dog or otherwise) is sometimes still treated as a search-based inquiry. *See id*. (rejecting claim arising from police dog's presence in an apartment based on the general rule that a dog sniff is not a "search" but concluding that, in any event, the dog's handlers were at a lawful vantage point when the dog alerted); *United States v. Navas*, 597 F.3d 492, 497 (2d Cir. 2010) (explaining "automobile exception" to warrant requirement permits

police to search vehicle interior for contraband based on probable cause); *McCardle v. Haddad*, 131 F.3d 43, 48 (2d Cir. 1997) (articulating other exceptions to warrant requirement, including automobile searches based on probable cause).

The law in this area is a little thin. But cases suggest that a police dog's improper entry into a vehicle can amount to a constitutional violation under a narrow set of circumstances. *See United States v. Rivera*, 89 F. Supp. 3d 376, 414 (E.D.N.Y. 2015) (collecting cases suggesting police conduct that causes a dog to jump into a vehicle without probable cause to search interior for contraband might constitute a Fourth Amendment violation), *aff'd sub. nom. United States v. Garrett*, 2022 WL 2979588, at *2 (2d Cir. July 28, 2022) (summary order).

Plaintiff's proposed amended complaint alleges that Rajchel was "personally involved" in conduct that might colloquially be understood by a layman as a "search" of the interior spaces of his vehicle. Whatever the precise label for that § 1983 Fourth Amendment claim might be, it can only survive against Rajchel's alleged conduct. *Cf. Mendez*, 581 U.S. at 428 (cautioning lower courts not to conflate distinct Fourth Amendment claims). After all, plaintiff does not allege that Harriman or Glynn were personally involved in the dog sniff or the search. In fact, plaintiff does not allege that Harriman or Glynn had anything to do with the manner, method, duration, and/or scope of Rajchel's search of the vehicle. Accordingly, plaintiff's § 1983 "unreasonable search" claim against Harriman (in Count Two) and plaintiff's § 1983 failure-to-intervene claims against Harriman and Glynn (in Counts Six and Eight) must be dismissed.

### 3. Deliberate Indifference

Plaintiff's proposed amended complaint asserts deliberate-indifference claims against Harriman and Rajchel (and, broadly construed, against Glynn) in Counts Three. According to

plaintiff, defendants were deliberately indifferent to his exposure to the winter elements during the allegedly prolonged traffic stop.

Defendants treat this as a substantive due process claim, but there is good reason to doubt whether these factual allegations are actionable as a distinct § 1983 claim. The Supreme Court has repeatedly held that resort to a substantive due process analysis is inappropriate where, as here, a specific constitutional amendment provides an explicit source of protection. *See, e.g.*, *Albright v. Oliver*, 510 U.S. 266, 274 (1994) (plurality opinion) ("The Framers considered the matter of pretrial deprivations of liberty and drafted the Fourth Amendment to address it.").

For instance, lower courts routinely apply this general principle to analyze a plaintiff's claims arising from a search or a seizure as Fourth Amendment issues rather than under the more general rubric of Fourteenth Amendment substantive due process. *See, e.g.*, *Cucuta v. N.Y. City*, 25 F. Supp. 3d 400, 417–18 (S.D.N.Y. 2014) (collecting cases). The application of this general principle would bar a substantive due process claim on this fact pattern: plaintiff alleges he was seized by police in a traffic stop, ordered out of his vehicle, and forced to stand in the cold while the police searched his car.

This raises search-and-seizure questions that arise under the Fourth Amendment. *Bryant v. City of N.Y.*, 404 F.3d 128, 135 (2d Cir. 2005). As discussed *supra*, a traffic stop conducted in an unreasonable manner can amount to a Fourth Amendment violation. Unreasonable conduct undertaken by police during this encounter would be part of this "reasonableness" inquiry. *See Cotto v. City of Middletown*, 158 F. Supp. 3d 67, 80 (D. Conn. 2016) (collecting cases in search context). This conduct would be relevant to the measure of damages. But unreasonable police conduct is usually not independently actionable as another kind of § 1983 claim. *See Cooper v.*

*City of New Rochelle*, 925 F. Supp. 2d 588, 612 (S.D.N.Y. 2013) (collecting cases for principle that abusive language during police search and seizure is not actionable as a § 1983 claim).

In any event, to the extent that plaintiff's allegations might be independently actionable under the rubric of the Fourteenth Amendment, any such § 1983 claim would still be subject to dismissal. To plausibly allege a substantive due process claim, the plaintiff must identify state action that was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998). But plaintiff has not plausibly alleged that Harriman, Rajchel, or Glynn engaged in conscience-shocking behavior.

Notably, plaintiff alleges that he was exposed to the winter elements for "at least an hour" while the allegedly unreasonable search-and-seizure occurred. Although there is no indication that plaintiff was handcuffed or otherwise held in involuntary custody during this period of time (such as with a show of coercive force), the closest Fourteenth Amendment analog on this set of facts would be akin to a pre-trial detainee's conditions-of-confinement claim.

In that context, trial courts have recognized that "exposure to freezing temperatures may constitute a Fourteenth Amendment violation[.]" *Stevens v. City of N.Y.*, 2011 WL 3251501, at *3 (S.D.N.Y. July 22, 2011). Indeed, the general trend in that area of constitutional law has been to apply a more plaintiff-protective standard. *See, e.g.*, *Edwards v. Arocho*, 125 F.4th 336, 350 (2d Cir. 2024); *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017). But the problem for plaintiff is that lower courts applying this emerging standard have still "generally found that allegations of exposure to mildly cold temperatures, or where the exposure to cold was short term, did not support claims of a constitutional deprivation." *Abdullah v. NYPD 30th Precinct*, 2024 WL 325385, at *6 (S.D.N.Y. Jan. 29, 2024) (collecting cases); *Lopez v. Phipps*, 2019 WL 2504097, at *8 (E.D.N.Y. June 17, 2019) (same).

Although there is no bright-line durational requirement, courts analyzing these exposure claims generally dismiss them unless the plaintiff alleges exposure to extreme heat or cold and for periods of time much longer than a day. *See Jallow v. Geffner*, 2024 WL 37073, at *14 (S.D.N.Y. Jan. 2, 2024) (collecting cases). As noted *supra*, plaintiff's complaint alleges that the whole encounter took roughly an hour. While the overall reasonableness of the officers' conduct can be assessed as part of plaintiff's surviving Fourth Amendment claims, his allegations do not state a plausible Fourteenth Amendment claim. Accordingly, plaintiff's deliberate-indifference claim must be dismissed against defendants Harriman, Rajchel, and/or Glynn in Count Three.

## V.    CONCLUSION

Plaintiff's cross-motion to amend will be granted to the extent that it states a new § 1983 claim against Harriman for an unreasonable pat-frisk. However, the remainder of plaintiff's new claims, including his claims against Glynn, must be dismissed as futile.

Therefore, it is

ORDERED that

1. Defendants' motion for a partial judgment on the pleadings (Dkt. No. 38) is GRANTED in part and DENIED in part;

2. Plaintiff's cross-motion to amend (Dkt. No. 43) is GRANTED in part and DENIED in part;

3. Plaintiff's proposed amended complaint (Dkt. No. 43 at pages 22–34) is ACCEPTED for filing as the operative pleading in this action;

4. The Clerk of the Court is directed to DOCKET the amended complaint;

5. The following § 1983 claims are DISMISSED from the amended complaint:

-the "prolonged stop" claim asserted against Rajchel in Count One;

-the "unreasonable search" claim against Harriman in Count Two;

-the "deliberate indifference" claim against all defendants in Count Three;

-the "pat frisk" claim against Glynn in Count Four;

-the "prolonged stop" claim asserted against Glynn in Count Five;

-the "*de facto* arrest" claim against Glynn in Count Five;

-the "failure-to-intervene" claim against Glynn in Count Six;

-the "failure-to-intervene" claim against Harriman in Count Eight; and

-the "*de facto* arrest' claim against Harriman in Count Nine;

6.  The following § 1983 Fourth Amendment claims REMAIN for discovery:

-the "prolonged stop" claim against Harriman in Count One;

-the "unreasonable search" claim against Rajchel in Count Two; and

-the "pat frisk" claim against Harriman in Count Seven;

7.  Officer Glynn is DISMISSED as a defendant from this action; and

8.  Plaintiff must, **within thirty (30) days**, sign and return to the Clerk the Rule 11 Certificate included with this Decision and Order; and

9.  Plaintiff is cautioned that his failure to sign and return the Rule 11 Certificate will result in his amended pleading being stricken from the docket.[6]

The Clerk of the Court is directed to terminate the pending motions and set an answer deadline for defendants Harriman and Rajchel to join issue on the amended complaint.

**IT IS SO ORDERED.**

---

[6] Plaintiff's proposed amended complaint is unsigned. Rule 11(a) of the Federal Rules of Civil Procedure and Local Rule 10.1(c)(2) require pleadings to be signed.

Dated:  June 16, 2025
        Utica, New York.

Anthony J. Brindisi
U.S. District Judge